**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**
**EAST ST. LOUIS DIVISION**

| | |
|---|---|
| PAULA JOHNSON, on behalf of herself and children of Eric Johnson, deceased, as Administrator of the Estate of Eric Johnson, and as Assignee of Prairie Farms Dairy, Inc. and P.F.D. Supply Corporation,<br><br>            Plaintiff,<br><br>        v.<br><br>TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, a Connecticut stock insuring corporation,<br><br>            Defendant. | )<br>)<br>)<br>)  Case No.: _____<br>)<br>)<br>)<br>)  JURY TRIAL DEMANDED<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **COMPLAINT**

NOW COMES Plaintiff, PAULA JOHNSON, on behalf of herself and children of Eric Johnson, deceased, as Administrator of the Estate of Eric Johnson, and as assignee of Prairie Farms Dairy, Inc. and P.F.D. Supply Corporation, by and through her undersigned counsel, and against Defendant, TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, who states and alleges as follows

### **NATURE OF THE ACTION**

1. This is an action for damages caused by a habitually reckless insurer that violated its duty of good faith and abandoned its insured in the context of a tragic wrongful death claim where the insured's exposure was nearly a quarter billion dollars.

2. As set forth herein, the conduct of Defendant Travelers Property Casualty Company of America is unprecedented in its utter disregard for the predictable harm that flowed from its years-long gamble with the fortunes of its insured, Prairie Farms Dairy, Inc., a farmer-owned dairy

1

cooperative based in Edwardsville, Illinois that employs thousands of people across multiple states.

3.     Travelers' repeated refusal to comport itself with the mandate of Illinois law to act in good faith and its repeated acts evincing Travelers' intent to place its own financial interests above that of its insured caused an underlying wrongful death case to be tried by one of the nation's leading plaintiff's personal injury firms resulting in a catastrophic adverse verdict and resulting judgment against Travelers' insured totaling $241 million dollars.

4.     Adding grave insult to that catastrophic verdict, that same insurer then refused to fully and unconditionally bond the judgment it caused, threatening the economic survival of its insured that has been in operation since 1938.

5.     Through this Complaint, Paula Johnson – widow, administrator of her husband's estate, and assignee of the claims of Prairie Farms – now seeks full redress and punitive damages for the willful refusal of Travelers Property Casualty Company of America to prevent the cascading set of harms that first befell Johnson and then Prairie Farms Dairy, Inc. and P.F.D. Supply Corporation when Travelers chose to place its own financial interests ahead of any consideration of the existential risks to its insured.

### THE PARTIES, JURISDICTION AND VENUE

6.     At all times relevant herein, Plaintiff, PAULA JOHNSON (hereinafter, "Johnson"), was and is, a resident and citizen of the State of Missouri residing in Manchester, Missouri.

7.     At all times relevant herein, Plaintiff, PAULA JOHNSON, was and is administrator of the Estate of her deceased husband, ERIC JOHNSON.

8.     Plaintiff, PAULA JOHNSON, brings this case as assignee of Prairie Farms Dairy, Inc. and P.F.D. Supply Corporation both individually and on behalf of the children of ERIC

2

JOHNSON, as administrator of the Estate of ERIC JOHNSON and in her capacity as the administrator of the Estate.

9.      At all times relevant herein, Plaintiff's assignor, Prairie Farms Dairy, Inc. (hereinafter, "Prairie Farms") was and is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Illinois.

10.     At all times relevant herein, Plaintiff's assignor, P.F.D. Supply Corporation. (hereinafter, "P.F.D. Supply") was and is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Illinois.

11.     At all times relevant herein, Defendant, TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA (hereinafter, "Travelers"), was and is a corporation organized and existing under the laws of the State of Connecticut, with its principal place of business in Connecticut, and is engaged in the business of writing policies of insurance, including in the State of Illinois.

12.     At all times relevant herein, Travelers was and is a liability insurer owing a duty of good faith and fair dealing to its named insureds, Prairie Farms and P.F.D. Supply (collectively, "Prairie Farms"), under insurance policy No. ZUP-10N45576-16-NF issued by Travelers (hereinafter, the "Travelers Policy").

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) as there exists complete diversity between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

14.     Venue for this action is proper in the Southern District of Illinois, East St. Louis Division, pursuant to 28 U.S.C. § 1391, because a substantial part of the acts and omissions giving rise to these claims occurred in this district and division, as set forth in detail below.

## FACTS COMMON TO ALL COUNTS

### *The Death of Eric Johnson*

15.     On August 5, 2016, Eric Johnson was a 64-year-old man who had been married to Plaintiff Paula Johnson for more than 40 years.  In that time, Eric and Paula raised five children into adulthood, two of whom are profoundly disabled and require constant care for their daily needs.

16.     At all times relevant hereto, Eric was self-employed as the owner and employee of a local courier service, CJS Express.  On the morning of August 5, 2016, Eric Johnson arrived at P.F.D. Supply's facility in St. Charles, Missouri in a small Honda hatchback to transport four coolers of frozen strawberries packed with dry ice to Fayetteville, Arkansas at the request of P.F.D. Supply.

17.     At ambient temperatures, "dry ice" (solidified carbon dioxide) sublimates directly from a solid into carbon dioxide gas.  Dry ice displaces oxygen within confined spaces and in the absence of proper ventilation.  Exposure to sublimating dry ice within an unventilated confined space can cause rapid disorientation and, eventually, asphyxiation and death.

18.     When Mr. Johnson arrived at P.F.D. Supply on August 5, 2016, an employee of P.F.D. Supply loaded the coolers into the back of the Honda hatchback occupied by Mr. Johnson without warning him of the dangers of sublimating dry ice within a confined space.

19.     Shortly after Mr. Johnson drove away from the facility, his car was observed in a parking lot just off the highway in St. Charles, Missouri, with the engine still running.  Mr. Johnson was found unconscious inside the locked vehicle, slumped over the steering wheel.  A police officer who broke the window to render aid to Mr. Johnson reported a smell coming from inside the vehicle that further investigation revealed was consistent with a large concentration of carbon dioxide.

20.     Mr. Johnson died three days later on August 8, 2016, leaving behind his wife of 42 years, Paula Johnson, and their five adult children.

***Paula Johnson files a tort claim on behalf of Eric's estate and her
five adult children, two of whom are profoundly disabled***

21.     On November 14, 2017, Johnson filed an action against Prairie Farms and eight other defendants seeking damages for Mr. Johnson's wrongful death pursuant to the Missouri Wrongful Death Act, Mo. Rev. Stat. § 537.080, captioned *Johnson v. Prairie Farms Dairy, Inc., et al.*, Case No. 2017 L 001562, Circuit Court for the Third Judicial Circuit, Madison County, Illinois (hereinafter, the "Underlying Action").

22.     Johnson alleged, *inter alia*, that Prairie Farms and its employees knew the dangers of transporting dry ice, had a duty to warn Mr. Johnson of these dangers, and failed to ensure proper training of its employees on the hazards of dry ice.  Johnson further alleged that no written protocols were in place to warn of these dangers, and that no warnings were provided to Mr. Johnson regarding the serious risks involved with the transportation of dry ice.

23.     Evidence adduced throughout the course of the litigation illustrated the profound loss experienced by the Johnson family as a result of Eric's death and how Plaintiff's damages model represented a uniquely high degree of financial risk for Prairie Farms insofar as Eric was the bedrock of a two-parent support system caring for two of their five adult children, both adopted, who are profoundly disabled and require constant assistance.

24.     Johnson's claims against Prairie Farms further sought damages for the aggravating circumstances[1] of Mr. Johnson's death pursuant to Mo. Rev. Stat. § 537.090 (allowing

---

[1] Mo. Rev. Stat. § 510.263 (eff. Aug. 28, 2005) provides where punitive damages are sought under Missouri law, including specifically, that "[a]ll actions tried before a jury involving punitive damages . . . shall be conducted in a bifurcated trial before the same jury if requested by any party."  Mo. Rev. Stat. § 510.263(1).  Pursuant to Mo. Rev. Stat. § 510.263(7) (eff. Aug. 28, 2005), the term "punitive damage award" means "an award for punitive damages or exemplary damages _or_ an award for aggravating circumstances."  *Id.* (emphasis added).  As stated therein, the terms

"aggravating circumstances attending the death" to be considered by the trier of fact "in every action" brought under the Missouri Wrongful Death Act).

25.    On or about October 17, 2024, the court in the Underlying Action granted Johnson leave to seek recovery of punitive damages under Missouri law and, in doing so, substantially increased the risk to Prairie Farms of an adverse judgment well in excess of Travelers policy limit.

26.    On or about October 21, 2024, counsel for Prairie Farms advised its insurers, including Travelers, that the court in the Underlying Action had granted Johnson leave to seek punitive damages.

27.    On or about April 8, 2025, Johnson filed her Third Amended Complaint in the Underlying Action.  As with all her prior pleadings, Johnson's Third Amended Complaint brought her claim pursuant to Mo. Rev. Stat. § 537.080, commonly known as the Missouri Wrongful Death Act.

28.    Johnson's Third Amended Complaint added additional counts against Prairie Farms and individuals acting within the scope of their employment for Prairie Farms, titled "Willful and Wanton Conduct/Punitive Damages" seeking damages for the aggravating circumstances of Mr. Johnson's death (Counts II, IV, VI, VIII, X).

### *Travelers Property Casualty Company of America and The Travelers Companies, Inc.*

29.    At all times relevant hereto, Travelers was one of a number a wholly owned subsidiaries of The Travelers Companies, Inc., a New York based multinational insurance conglomerate that is the second-largest writer of commercial property casualty insurance in the United States.  The Travelers Companies, Inc. is traded on the New York Stock Exchange under

---

"punitive damages" and "aggravating circumstances damages" are used interchangeably.  Prairie Farms had previously moved to strike Johnson's prayer for relief for damages arising out of aggravating circumstances, which the court in the Underlying Action had granted in December of 2019 without prejudice to refiling.

the symbol "TRV."  For purposes of this Complaint, the Travelers Insurance Companies, Inc. shall be referred to as "TRV."

30. By virtue of its status as a publicly traded company, TRV is subject to regulation by the U.S. Securities and Exchange Commission and the provisions of the Sarbanes-Oxley Act, as amended.

31. At all times relevant hereto, pursuant to its obligations under Sarbanes-Oxley and other regulatory provisions, TRV was, and is, required by law to disclose to its investor community certain material risks it faces in the course of its business operations and to describe the nature of its business generally.

32. At all times relevant hereto, pursuant to its obligations under Sarbanes-Oxley and other regulatory provisions, TRV revealed in successive filings with the United States Securities and Exchange Commission that it operates this enterprise of subsidiary insurance companies from the top down.

33. In the context of managing risk, TRV and, by extension, Travelers, uses what it refers to as its Enterprise Risk Management program, or ERM ("ERM"), in conjunction with its claims services department.

34. Through ERM, TRV develops, implements and executes a centralized and uniform risk management program for all of its subsidiaries, including the Defendant Travelers.

35. TRV's board of directors and its Risk Committee have direct oversight and control of the ERM program.

36. TRV's top-down control of risk is executed by approximately 12,300 claims services employees, which operate in 15 claims centers and 57 satellite specialty offices in 42 states, including Illinois.

37.     TRV employs approximately 30,000 people and holds total assets in the amount of $133 billion.  According to TRV's 2025 annual report filed with the United States Securities and Exchange Commission ("SEC"), TRV's revenues in 2025 were $48.8 billion.  For the revenues it earned from the premiums paid by its insureds like Prairie Farms, TRV reported earnings of $43.9 billion for 2025, a 5% increase over that of 2024.

38.     The publicly facing marketing efforts of TRV obfuscates the delineation between TRV and its various subsidiaries, such that marketing materials and TRV's website most often refer to "Travelers" as a general descriptor encompassing all of its subsidiary companies, including Defendant Travelers Property and Casualty Company of America.

39.     TRV's online marketing efforts[2] trumpet TRV's self-proclaimed image as a trusted insurer in its commercial lines and a broad array of other insurance:

> **We are an insurance company that cares.**
> We believe remarkable things happen when people care. Travelers takes on the risk and provides the coverage and service you need to help protect the things that are important to you – your home, your car, your valuables and your business. Over the past 170+ years, we have earned a reputation as one of the best property casualty insurers in the industry because of our extraordinary dedication to our customers and our communities.

40.     Its self-laudatory proclamations touting its "deep risk experience" and protection of its insureds' businesses bear no resemblance to the functional reality, however, as Prairie Farms eventually learned.  Indeed, in recent years, TRV's subsidiary companies have, under the claims assessment rubric promulgated by TRV, been the target of claims of vexatious coverage denial and bad faith litigation, including one TRV subsidiary that was ordered to pay $43.8M in connection with a bad faith lawsuit stemming from a wrongful conviction in Missouri.

---

[2] https://www.travelers.com/about-travelers

***Travelers' abandonment of Prairie Farms in violation of the Travelers Policy***

41.     At all times relevant hereto, Prairie Farms was insured by Travelers pursuant to Specialty Commercial Umbrella Liability Policy No. ZUP-10N45576-16-NF in effect from April 1, 2016 to April 1, 2017 providing first layer umbrella/excess coverage with limits of $10 million in excess of a $2 million primary policy.  A true and correct copy of the Travelers Policy is attached hereto as *Exhibit A*.

42.     Under the terms of the Travelers Policy, Travelers agreed to pay on behalf of Prairie Farms "those sums in excess of the [first layer primary coverage] that [Prairie Farms] becomes legally obligated to pay as damages because of . . . Bodily Injury or Property Damage . . . caused by an Occurrence . . . anywhere in the world[.]" (*Exhibit A*, Section I.A.)

43.     At all times relevant, Prairie Farms was insured at the primary level by ACE American Insurance Company ("Chubb") Commercial General Liability Policy No. HDO G27406038 in effect from April 1, 2016 to April 1, 2017. (hereinafter, the "Chubb GL Policy").  The Chubb GL Policy provided primary per occurrence limits of $2 Million,[3] underlying the Travelers $10 million Policy.

44.     Well prior to the trial of the Underlying Action, Chubb tendered its underlying limits to Travelers, thus triggering Travelers' control of settlement and all related duties under Travelers' policy to either obtain a settlement within the limits of its policy or, like Chubb, tender its limits to Prairie Farm's next higher layer excess insurers above Travelers.

45.     As a consequence of Chubb's tender, the burden of settlement of the claims against Prairie Farms fell squarely to Travelers upon tender by Chubb of its primary limits.  Travelers therefore controlled all aspects of settlement of the Underlying Action.

---

[3] Within Chubb's $2 million primary layer, Prairie Farms bore responsibility for a $1 million self-insured retention.

46.   Given the staggering risks involved with taking the matter to trial and given the fact that any reasonable settlement range would begin with an amount in excess of Travelers' limit of insurance, it was incumbent upon Travelers to tender its policy limits to the next layer excess insurer to effectuate a settlement of the Underlying Action.

47.   As set forth in the foregoing paragraphs, Travelers' conduct throughout the course of the Underlying Action reflected an irresponsible and shocking passivity, repeatedly ignoring its own insureds demand to tender its policy limits for settlement, and making no realistic proposals for settlement of its own given the clear strengths of Johnson's claims in the Underlying Action.

48.   The Travelers Policy covered Prairie Farms for matters alleged in the Underlying Action, including Johnson's wrongful death claims.

49.   At all times relevant hereto, Prairie Farms complied with all obligations imposed upon it by that Travelers Policy.

50.   Despite repeated demands by Prairie Farms to Travelers to tender its limits prior to trial, Travelers refused to do so.

51.   Based on the facts and circumstances of the Underlying Action, combined with the well-documented track record of Johnson's trial counsel in securing numerous nine-figure verdicts in single plaintiff personal injury cases, Travelers knew or should have known there existed a substantial probability of a verdict in favor of Johnson well in excess of the Travelers Policy limits if Johnson's claim against Prairie Farms was not settled prior to trial.

52.   During the course of the Underlying Action, Johnson's counsel made settlement demands upon Prairie Farms' counsel offering Prairie Farms the opportunity to settle Johnson's claims utilizing the full limit of the Travelers Policy.  If Travelers had made its Policy limits available in settlement, the obligations of Prairie Farms excess insurers providing coverage in

excess of the Travelers Policy limit would have then been activated and available to Prairie Farms in settlement of the Underlying Action.

53.    Prairie Farms made numerous demands to Travelers to make the Travelers Policy limits available so that the Underlying Action could be settled. Travelers refused these demands.

### *Travelers imperils the financial condition of Prairie Farms*

54.    In 2023, the law firm of Salvi, Schostok and Pritchard (hereinafter, "SSP") had entered its appearance on behalf of Paula Johnson and assumed full control of the litigation in advance of trial, with attorney Patrick Salvi, Jr. (hereinafter, "Salvi") as the lead attorney.

55.    Travelers and Prairie Farms were well aware that SSP and Salvi were well known for having obtained several record verdicts throughout Illinois, including a $363,000,000.00 verdict for a single plaintiff in a 2022 case that also involved exposure to a dangerous chemical.

56.    By 2024, the threat of being on the receiving end of a punitive damages award was no longer theoretical for Prairie Farms.  On October 23, 2024 – the same day the court in the Underlying Action entered its written order on Johnson's motion for leave to seek punitive damages – all parties were directed to attend a second mediation given the reality of this new procedural posture and greatly heightened risk to Prairie Farms.  In the context of the mounting risk Prairie Farms faced, the trial court instructed the parties "to go back to mediation and try to get this thing settled."

57.    On November 6, 2024, *before* Johnson had actually amended her complaint to add a claim for punitive damages claim pursuant to the trial court's order, all parties to the Underlying Action attended a court-ordered mediation.

58.    Prior to attending the court-ordered mediation, no insurer, including Travelers, had asserted any reservations or limitations on coverage through a reservation of rights or otherwise.

59.     During the course of mediation, Johnson made a settlement demand upon Prairie Farms for $102,000,000.00, representing the full applicable combined limits of insurance available to Prairie Farms across all layers of Prairie Farms' insurance (hereinafter, "Johnson's Second Settlement Demand").

60.     Johnson's Second Settlement Demand – presented by SSP and Salvi – was accompanied by a strong showing of liability and detailed information on, and support for, the damages sought.  The Second Settlement Demand was further buttressed with the experience of a new firm and its trial lawyers who had a demonstrated track history of securing large, record-setting eight and nine-figure verdicts well above policy limits.

61.     At the time of Johnson's Second Settlement Demand, the exposure presented by Johnson's compensatory damages alone far exceeded the Travelers Policy limits.

62.     At the time of Johnson's Second Settlement Demand, a reasonable probability existed of an adverse verdict that would exceed not only Travelers' Policy limit, but the entire limits of Prairie Farms' total combined insurance coverage.

63.     Johnson's Second Settlement Demand represented another reasonable opportunity for Travelers to settle within its policy limits.

64.     Once again, Travelers refused the renewed opportunity to settle the litigation within Prairie Farms' total insurance coverage that was presented at the court-ordered mediation when Travelers once again refused to make its policy limit available in settlement.

65.     Inexplicably, Travelers dribbled in at mediation a high offer of only $3,000,000.00; a figure representing less than 2% of the total settlement demand and one-tenth of the coverage that fell within Travelers' own layer.

12

66.    By refusing to make its policy limits available in settlement, Travelers had once again persisted in foreclosing Prairie Farms' excess insurers with policy limits above Travelers from participating in settlement.

***Chubb and Travelers belatedly issue purported reservations of rights letters***

67.    As a plain reading of Plaintiff's various amended complaints averred, the risk of an adverse punitive damages verdict against Prairie Farms was embedded in the egregious liability profile of the case from the very beginning.

68.    Yet on November 11, 2024, nearly seven years after Paula Johnson filed her case, Chubb for the first time sent a one-page letter to Prairie Farms declaring that it was reserving its rights as to any punitive damages imposed at trial.  Chubb's 1-page "reservation of rights" letter provided, in pertinent part:

> "Defense counsel provided an update on October 21, 2024 via e-mail advising that the trial Judge granted the plaintiff's motion and allowed the plaintiff to amend the Complaint to seek punitive damages for this case.  The Judge applied Missouri law with respect to this ruling.
>
> Please note that punitive damages are not insurable in Illinois, where the policy was issued, nor are they insurable in Missouri, as against public policy.  Accordingly, any such award in this case will be outside the scope of coverage and will be the responsibility of Prairie Farms Dairy, Inc."

69.    No written insuring agreement nor any endorsement contained in the Chubb GL Policy specifically excluded punitive, exemplary, or multiple damages from the scope of insurance.

70.    On April 3, 2025, Travelers followed suit, sending a notice to Prairie Farms that it too had reserved its rights as to any punitive damages.  Travelers' "reservation of rights" letter provided, in pertinent part:

> "Travelers is advised that the trial Judge granted the plaintiff's motion to amend the complaint to seek punitive damages in the

13

captioned action (the "Action") but Travelers understands that to date, no amended complaint asserting a count for punitive damages has been filed.

. . . .

The Travelers Policy contains a 'Punitive Or Exemplary Damages Endorsement – Illinois'. Travelers Reserves its right to deny coverage for any punitive damages award that is not within the coverage of the "Punitive Or Exemplary Damages Endorsement – Illinois" or that is otherwise uninsurable under applicable law."

71.     Contrary to Travelers reservation of rights, the "Punitive Or Exemplary Damages Endorsement – Illinois" contained in the Travelers Policy, actually *confirms* coverage for Prairie Farms' vicarious liability for punitive or exemplary damages.

72.     The Travelers Policy "Punitive Or Exemplary Damages Endorsement – Illinois" expressly provides:

"However, to the extent this policy is construed . . . pursuant to law other than Illinois law, punitive or exemplary damages that are awarded because of loss covered by and paid under this policy *shall be considered damages covered by this policy* if such punitive or exemplary damages:
1.  are awarded in a judgment that also awards compensatory damages covered by and paid under this policy, and
2.  are insurable under the law of any jurisdiction that is most favorable to the insurability of such damages and that:
    a.  has a substantial relationship to the Insured, the Suit in which the judgment was awarded, or this policy[.]"   (emphasis added).

73.     Lost in Travelers' cynical calculation to turn a blind eye to its insured's immense exposure to an excess verdict was the fact that the impending harm that was now likely to befall Prairie Farms included punitive damages, a fact that by itself should have awoken Travelers to give at least equal consideration to the interests of its insured when the only prudent course left to Travelers was to tender its policy and allow the excess carriers to contribute to a negotiated resolution.  Travelers chose otherwise.

14

***As Prairie Farms faced the imminent prospect of an excess verdict, Travelers turned against its insured in a bungling attempt to intervene in the Underlying Action to deny coverage and thus increase the risk of financial disaster to Prairie Farms***

74.     On August 12, 2025, Travelers moved for leave to intervene in the Underlying Action solely to submit unidentified proposed jury instructions and a verdict form at trial.

75.     Travelers' overt justification for intervention was not to assist its insured, but rather to submit proposed jury instructions and a verdict form solely to attempt to advance its own interests above that of its insured and in order to minimize coverage by allocating damages between what it contended were covered and non-covered damages under its Policy. By doing so – as if its refusal to settle was not inflicting enough harm upon its insured – Travelers was now overtly acting in direct conflict with its insured's interests. Indeed. Travelers' actions demonstrated it had no plan whatsoever to authorize settlement – even at a value approximating the compensatory damages presented by the Underlying Action.

76.     Here, Travelers did not even pretend to act in the interests of its insured. Attached as exhibits to its motion for leave to submit proposed jury instructions and verdict form were copies of the Travelers Policy, the Chubb GL Policy, and both its own April 3, 2025 "reservation of rights" letter as well as Chubb's November 11, 2024 "reservation of rights" letter.

77.     Absent from Travelers' moving papers were the jury instructions it proposed to submit, or any discussion of how it intended to parachute into the jury trial of a tort claim as a non-party to ostensibly take a position on the submission of instructions that, by design, would inure to the detriment of its insured.

78.     Travelers' inherent conflict of interest between advancement of its own interests over the interests of its insured was, or should have been, clear to any reputable insurer.

15

79.    Travelers knew or should have known that its intervention efforts created an inherent conflict of interest between it and its insured.

80.    Travelers' attempt to intervene was calculated solely to preserve Travelers' ability to later deny, limit, or contest coverage and to avoid or minimize its insurance obligations, rather than to secure a prompt and reasonable settlement protecting its insured, Prairie Farms.

81.    By prioritizing its own financial interests, Travelers foreclosed settlement negotiations, chilled meaningful resolution discussions, and increased the likelihood of an excess judgment.

82.    Against this backdrop, Travelers persistently ignored the urgent demands of its insured to correct course and tender its policy limits so that excess carriers above Travelers could have a meaningful opportunity to pursue a negotiated resolution and avoid the foreseeable, disastrous outcome that Prairie Farms was desperately seeking to avoid.

83.    At the forefront of Travelers' continuing course of bad faith was Matthew Therrien, an "AVP Excess Claims FL Company Employee Adjuster" for Travelers who worked in the "America Strategic Resolution Group"

84.    On December 18, 2025, Prairie Farms' General in-house counsel Kitt Webb sent an email to Therrien protesting Travelers' refusal to follow the advice of defense trial counsel on settlement and botched attempt to intervene for no other purpose than to disenfranchise Prairie Farms:

> "Matt- If I recall correctly, you are monitoring a case at trial. The point of my request was to give you a heads-up courtesy that the attached will be going out tomorrow addressed to you and copying the tower [of excess insurers]. Travelers continued refusal to follow [trial counsel's] legal advice on settlement, the denied request to intervene, and now the pushing of counsel to enter their appearance are all items that are against Prairie Farms' interest and can't go unresponded to. I wanted to note as well that the unnecessary litigation tactics have been done without giving any sort of courtesy or notice to your insured. It would be proper and professional to let us know that Travelers' planned to intervene or that Travelers

16

is hiring a Chicago attorney to get involved without us having to find out through a court filing or having that attorney show up unannounced on a group conference call. Travelers is clearly acting in its own interest and not cooperating with Prairie Farms in defense of this case..."

85.     On December 19, 2025, Prairie Farms' Kitt Webb sent a letter to Therrien underscoring the urgency of the predicament Prairie Farms faced as a result of Travelers' refusal to act in good faith to protect the interests of its insured.  In again demanding the full tender of Travelers' policy limit, Webb wrote, *inter alia*, the following:

"Please accept this letter as a formal demand from Prairie Farms to Travelers to authorize settlement of the above-mentioned matter for Travelers' full policy limits. You have received recommended settlement ranges from counsel based on detailed and experienced evaluation of the case and you continue to refuse to authorize your contracted amount so that a reasonable settlement can be obtained. Travelers' unwillingness to contribute its policy limits thus far is in direct conflict with Prairie Farms' litigation strategy and its insurable interests. Further, this refusal to provide the paid-for insurance coverage for settlement purposes exposes additional insurers to unnecessary liability by forcing this case to go to trial."

86.     Webb further noted that the sophomoric approach of Therrien and Travelers in putting forth absurdly low settlement offers in piecemeal fashion and its ham-handed attempt to intervene were putting Prairie Farms in the untenable position of having to go to trial in a case with immense risk far beyond the Travelers' layer of insurance:

"Therefore, if you continue to only authorize a fraction of your policy limits and force this case to go to trial, Prairie Farms demands that Travelers covers and indemnifies Prairie Farms for all damages from or related to the Johnson matter. Further, Travelers' unnecessary litigation tactics of petitioning to intervene and hiring secondary counsel are directly in conflict with Prairie Farms' interests in this case as well as the other insurers. These actions only serve Travelers' interests at the expense of Prairie Farms and the other contracted parties. Prairie Farms calls on all carriers copied on this letter or who Prairie Farms has paid for coverage under its general liability and any additional or reinsurance agreements, be prepared to cover all awarded damages.

I call your attention to John Hiller's letter of April 8, 2025 to Kevin Conway of Chubb. In that letter, Prairie Farms noted Chubb's actions related to its exceedingly and knowingly late issuance of a reservation of rights that irrevocably prejudiced Prairie Farms insurable interest leading to the unsuccessful mediation of this case. The refusal by Travelers to settle this case for its policy limits described above are distinct and separate from Chubb's

17

actions, but both are in direct conflict with Prairie Farms' interests as an insured and its successful resolution of this covered matter."

87.     Webb's December 19, 2025 communication concluded, "Prairie Farms intends to hold Travelers and Chubb accountable for their actions and for any resulting liability imposed on Prairie Farms. Prairie Farms also expects that additional layers of insurance that become impacted due to Travelers' and Chubb's actions to also hold the responsible parties to account."

88.     Therrien's written response to Webb's December 19, 2025 communication came twelve days later on December 31, 2025 stating, *inter alia*:

> "Dear Mr. Webb: On behalf of Travelers Property Casualty Company of America ("Travelers"), I acknowledge receipt of your letter dated December 19, 2025, regarding the above referenced matter. Travelers has carefully evaluated the Johnson matter based on the facts of the case. Our settlement position reflects a reasonable assessment of the case value considering all relevant factors, including liability exposure, damages, and the strength of available defenses. As you know, the current settlement offer in this case is $3,000,000, and Travelers has indicated its willingness to continue negotiations. However, as you are aware, there is no settlement demand from plaintiff's counsel at this time, which limits our current ability to engage in meaningful settlement negotiations."

89.     As had been Travelers' routine practice throughout the course of the litigation, Travelers provided no rationale or any cohesive thought behind why it continued to risk the financial future of its insured, but rather repeated the empty sloganeering that Travelers' wildly misplaced valuation was mythically "reasonable."

90.     On January 15, 2026, Webb sent another letter to Therrien and Travelers noting the paucity of the prior $3,000,000.00 offer and the critical need for Travelers to tender its full $10,000,000.00 layer in view of the recommendation of experienced trial counsel for the defense whom Travelers had worked with for many years that an offer of at least $15,000,000.00 would be required to bring Prairie Farms into a realistic settlement range:

> "Thank you for your letter dated December 31, 2025, responding to mine of December 19, 2025. You note that Travelers has authorized a settlement offer of $3,000,000 and remains willing to continue negotiations. This amount consists of $1 million from Prairie Farms as

its self-insured retention, $1 million from Chubb as the primary liability insurer, and $1 million from Travelers on a policy with $10 million in available limits. In other words, Travelers is contributing only 10% of its policy limit, while Prairie Farms and Chubb are each contributing 100%.

As Prairie Farms' counsel has advised, and in light of the judge's ruling permitting punitive damages, any realistic settlement range will require an offer of at least $15 million. Although Prairie Farms obviously prefers that its insurers pay as little as possible, Travelers' current position—offering $3 million in the face of a long-serving attorney's valuation more than four times that amount—reflects a failure to make a good-faith effort to resolve this matter and is not a reasonable assessment of the case value. The settlement offer does not even approach the likely verdict range if an adverse verdict is rendered.

To facilitate a meaningful settlement discussion, Prairie Farms hereby demands that Travelers authorize the full $10 million in coverage for which Prairie Farms has paid and to which it is reasonably entitled. Then, we can work cooperatively to negotiate the lowest reasonable settlement possible in a bona fide attempt to resolve the case."

91.    Webb's January 15, 2026 communication also foretold of the harm to the excess carriers caused by Travelers' stubborn refusal to change course:

"If Travelers continues to refuse to authorize a reasonable contribution toward settlement (i.e., 10% of its limits), I will begin contacting the excess and umbrella carriers. Based on the current posture of the case, it is apparent that a trial verdict would quickly implicate their layers due to Travelers' failure to authorize a meaningful settlement offer."

### *Travelers squandered a final opportunity to settle on the eve of trial*

92.    On the eve of trial, Travelers had done all within its power to sabotage the prospect of settlement and endanger the financial well-being and institutional reputation of its insured, Prairie Farms.  In the wake of lowball settlement offers, two failed mediations and a liability profile that portended a verdict at the low end exceeding $100,000,000.00, Travelers had already firmly cemented its bad faith position in stark terms.

93.    Notwithstanding Travelers' intransigence, on or about February 5, 2026, less than two weeks before trial was set to begin on February 17, 2026 in the Underlying Action, Johnson made a time-limited bracketed settlement demand upon Prairie Farms.

94.     Both the upper and lower limits of this bracket fell well within the applicable combined limits of insurance available to Prairie Farms.  Johnson's time-limits demand expired at 5:00 p.m. Central Time on February 10, 2026 (hereinafter, "Johnson's Third Settlement Demand").

95.     Johnson's Third Settlement Demand was accompanied by an even stronger showing of liability and detailed information regarding, and support for, compensatory damages in excess of Traveler's Policy limit.

96.     Johnson's Third Settlement Demand represented a remarkable and altogether reasonable opportunity for Travelers to tender the limits of its Policy in settlement of the Underlying Claim even after it had long ago put itself in a bad faith posture with respect to its handling of the claim.

97.     Prior to 5:00 p.m. Central Time on February 10, 2026, Chubb reiterated its tender of its primary policy limits of two million dollars.

98.     Prior to 5:00 p.m. Central Time on February 10, 2026, Prairie Farms itself, through its general counsel and retained coverage counsel, demanded its insurers, including Travelers, make their respective policy limits available at least up to the lower bracket limit of Johnson's Third Settlement Demand.

99.     On Monday, February 9, 2026 at 7:23 p.m., attorney Paul Walker-Bright sent on behalf of Prairie Farms an urgent email to Travelers, Chubb and the other excess insurers demanding that the insurers collectively make available all respective policy limits up to the $67 million upper bracket of Plaintiff's demand:

> "As you know, on February 5, 2026, the plaintiff's attorneys in the Johnson Lawsuit sent a settlement demand that expires at 5:00 p.m. Central Time tomorrow, February 10, 2026 (attached). It is imperative that the insurers authorize Prairie Farms' defense counsel to make an offer in response to the demand prior to its expiration. The current demand is well within the total limits of Prairie Farms' available insurance and presents an opportunity to reach a reasonable settlement of the Johnson Lawsuit. Therefore, Prairie Farms demands

that the insurers make their respective policy limits available – up to the current upper limit of the plaintiff's bracket of $67 million – and provide a response bracket to the plaintiff's proposed bracket for defense counsel to convey prior to 5:00 p.m. tomorrow. Please advise immediately. Thank you."

100.    The following morning, Tuesday, February 10, 2026, Prairie Farms General Counsel Kitt Webb emphasized the critical need for Travelers to – at a minimum – respond to the 5 p.m. deadline that day with a settlement offer that was at least at the $12,000,000.00 lower limit

> "I want to note for the group that Prairie Farms remains seriously concerned about how an excess or punitive verdict could impact its insurable interests or potentially exceed its liability limits under the tower. Consistent with Paul's demand below on behalf of Prairie Farms, the insurers have a duty to reasonably explore settlement. This necessarily includes responding by the deadline and doing so with an amount at least at the lower limit of the plaintiff's proposed bracket.
>
> Failing to timely respond—or continuing to offer only a fraction of the coverage Prairie Farms has paid for—will expose additional insurers above the current level to unnecessary risk, as well as full liability for all damages in the event of an adverse verdict."

101.    On February 10, 2026, Matthew Therrien sent Johnson's lead attorney Patrick Salvi, Jr. a letter via email rejecting the settlement proposal, feigning a posture that Travelers was somehow powerless to act because the proposed bracket extended beyond Travelers' single layer. Therrien framed Travelers' position as follows:

> "…For the reasons stated herein, Travelers rejects your offer. As a preliminary matter, Travelers cannot agree to any "bracket" that is not within the limits of the Travelers Policy…"

102.    In the next breath, however, Therrien lobbed a final lowball offer to Johnson:

> "Furthermore, while we appreciate your willingness to reengage in settlement discussions, Travelers' evaluation of the case differs from yours.  As you are well aware, this matter involves significant disputes as to liability, causation and damages. Nevertheless, recognizing the impact this situation has had on Mrs. Johnson and her family, Travelers remains willing to continue its good faith settlement negotiations with your client and, as such, agrees to increase its settlement offer to $4,500,000."

103.    The February 10, 2026 salvo in Travelers' continuum of bad faith was the last settlement communication before trial. Plaintiff promptly revoked all settlement offers and related discussions for a negotiated pre-trial resolution of the case.

104.    Yet again, Travelers had unreasonably and irresponsibly refused to tender the limit of its Policy in the face of all settlement demands, and all available evidence demonstrating a great likelihood of an adverse verdict at trial well in excess of Travelers Policy if settlement of the Underlying Action was not achieved.

***A jury trial in the Underlying Action culminated in a $241,000,000.00 verdict, consistent with prior warnings Travelers received of the consequences of its refusal to settle***

105.    On February 17, 2026, a jury trial commenced in the Underlying Action.  During voir dire, each of the jurors polled indicated that if the law and evidence supported it, they would be willing to sign a compensatory verdict of $50,000,000.00 or more.

106.    The jury in the Underlying Action was instructed that Prairie Farms could be held vicariously liable for the negligence of its employees and similarly instructed that if Prairie Farms was found vicariously liable for the negligence of its employees, damages for aggravating circumstances could also be awarded against Prairie Farms.

107.    As a result of Travelers' failure and refusal to settle, the jury in the Underlying Action reached a verdict on February 27, 2026 in favor of Johnson and against Prairie Farms in the amount of $241,000,000.00.

108.    The $241,000,000.00 verdict was comprised of $49,500,000.00 in compensatory damages and $190,000,000.00 in aggravating circumstances damages against Prairie Farms, Inc. and $4,500,000.00 in compensatory damages and $1,500,000.00 in aggravating circumstances damages against P.F.D. Supply (hereinafter, the "Judgment").  (*See, Exhibit B*, February 27, 2026 Verdict Form).

*Travelers' pattern of bad faith continued unabated – even after a nearly quarter billion-dollar judgment against its insured and an impending financial disaster for Prairie Farms*

109.    In rendering its verdict, the jury in the Underlying Action did not differentiate whether its award for damages for aggravating circumstances was based on the Defendants' own conduct, or based on the conduct of its officers, agents, and/or employees while acting within the scope and course of their employment for Prairie Farms.

110.    Following the jury's verdict, Travelers violations of its obligation owed to Prairie Farms continued unabated.  Faced with $241 Million adverse Judgment, Travelers did nothing while Johnson initiated efforts to collect on that Judgment through statutory post-judgement proceedings.

111.    Subsequent to the jury's verdict, citations to discover assets were promptly issued by Johnson and served upon Prairie Farms and its subsidiaries, including P.F.D. Supply.

112.    Subsequent to the jury's verdict, third-party citations to discover assets were promptly issued by Johnson and served upon scores of banks with which Prairie Farms and P.F.D. Supply did business.

113.    By operation of Illinois law, each of these citations to discover assets created liens in favor of Johnson as the judgment creditor from the moment service was perfected.

114.    The citations further permitted Johnson as the judgment creditor to engage in discovery regarding the finances of Prairie Farms and P.F.D. Supply as the judgment debtors and to execute upon any non-exempt assets to satisfy her $241 million judgment.

115.    The citations liens, quite literally, froze in place all non-exempt assets of Prairie Farms and P.F.D. Supply and prohibited not only Prairie Farms and P.F.D. Supply from dissipating them, it enjoined all banks, suppliers and customers of Prairie Farms and P.F.D. Supply from making any payments to Prairie Farms and P.F.D. Supply in the ordinary course of business.

23

116.     The catastrophic ripple effect of these enforcement mechanisms based on the trial court's $241 million judgment entered on the jury's verdict caused immediate economic and reputational harm to Prairie Farms and P.F.D. Supply, as they scrambled to manage the dozens of urgent inbound inquires from third-party citation recipients and faced the prospect of being unable to pay employees or procure supplies that their continuing existence as businesses depended upon.

117.     The gravity of the situation was made clear to Travelers by Prairie Farms General Counsel Kitt Webb in an email on March 7, 2026, who stressed[4] the devastation Prairie Farms had to manage as a result of Travelers' breach of its duty of good faith to its insured:

> "This letter follows and incorporates Prairie Farms Dairy, Inc.'s prior written settlement demands, including those transmitted by email and formal correspondence attached, all of which are expressly reaffirmed.

> As you all are undoubtedly aware, pursuant to post-judgment citation proceedings under Illinois law, **Prairie Farms' bank accounts have been frozen**, and Prairie Farms has been **judicially restrained from conducting ordinary financial operations**. In addition, **Prairie Farms' customers have been ordered by citation not to remit payment** of any amounts owed. These conditions have now persisted for two full business days and remain subject to indefinite continuation.

> Any party familiar with judgment enforcement in Illinois understands the consequences of such measures. **Prairie Farms cannot survive more than a limited number of additional business days under these conditions."**

*******

> "The judgment entered in the amount of **$240 million**, together with prejudgment interest expected to be approved by Judge Ruth, will exceed **$380 million**. Counsel advises that an appeal bond in the amount of 1.5x the judgment—approximately **$570 million**—will be required. Annual bond premiums alone are estimated to exceed $10 million per year.

> At the same time, Prairie Farms' lenders are themselves subject to citation and prohibited from extending credit, and letters of credit of this magnitude may be unattainable under the current freezes. Prairie Farms has no access to cash as collateral to post a bond. As a result, **an appeal may be functionally impossible**.

---

[4] Emphasis in the original.

This is not rhetoric. It is the practical reality created by the judgment and exacerbated by your coverage positions.

**Notice of Ongoing Damages and Intent to Act**

The damages currently accruing to Prairie Farms **exceed $10 million per day**. Time is therefore of the essence.

Prairie Farms remains willing to discuss a resolution collectively. However, continued silence, refusal to contribute, or further delay by each member of the tower will be deemed a deliberate choice to force Prairie Farms to take whatever actions are necessary to protect itself, its over 500 farmer members, and its nearly 9,000 employees."

118.    In the face of these pleas, Travelers remained unmoved by the plight of its insured now facing existential risks and a ballooning financial crisis, as it refused to fully and unconditionally bond the Judgment so that Prairie Farms could stay enforcement on the Judgment pending an appeal.

119.    Travelers continued its ongoing pattern of bad faith when, following entry of the judgment and Johnson's motion for leave to amend the complaint to conform the complaint to the proofs at trial, Travelers again attempted to intervene to object to the amended complaint in direct conflict with its insured's interest.

120.    Faced with this avalanche of damaging consequences – all due to Travelers' bad faith abandonment of its insured – Prairie Farms entered into a post-verdict settlement of the Underlying Action and an assignment of rights with Johnson upon which this action rests.

**COUNT I: Bad Faith (Common Law)**
***(Plaintiff v. Defendant TRAVELERS)***

121.    Plaintiff repeats and re-alleges Paragraphs 1 through 120 as if fully set forth herein.

122.    At all times relevant hereto, Travelers owed a duty to Prairie Farms to not place its interests ahead of the interests of its insured.

123.    At all times relevant hereto, Travelers owed a duty to Prairie Farms to give as much consideration to Prairie Farms' interests as it gave to its own interests.

25

124. At all times relevant hereto, Travelers owed a duty to Prairie Farms to refrain from conduct constituting fraud, negligence, or bad faith in refusing to settle a case within policy limits.

125. At all times relevant hereto, Travelers owed a duty to Prairie Farms to not cavalierly gamble with its insured's money.

126. At all times relevant hereto, Travelers owed a duty to Prairie Farms to exercise care and skill to insulate its insured from liability.

127. At all times relevant hereto, Travelers owed a duty to Prairie Farms to not unreasonably or vexatiously delay tender of the Travelers Policy in settlement given the facts of the Underlying Action.

128. At all times relevant hereto, Travelers owed a duty to Prairie Farms to not unreasonably or vexatiously delay the tender of the Travelers Policy in settlement given the grave financial risks to its insured, Prairie Farms.

129. At all times relevant hereto, Travelers owed a duty to Prairie Farms to fully and fairly investigate the Johnson claim.

130. At all times relevant hereto, Travelers owed a duty to Prairie Farms to fully and fairly evaluate the merits of the Johnson claim.

131. At all times relevant hereto, Travelers owed a duty to Prairie Farms to not attempt to settle the Johnson claim for less than it was reasonably worth.

132. At all times relevant hereto, Travelers owed a duty to Prairie Farms to not misrepresent its policy language in an effort to defeat coverage where coverage existed.

133. At all times relevant hereto, Travelers owed a duty to Prairie Farms to refrain from conduct that interfered with Prairie Farms' defense in the Underlying Action by attempting to intervene as if Travelers were an actual named party entitled to co-equal participation.

26

134.  At all times relevant hereto, Travelers owed a duty to Prairie Farms to refrain from taking a settlement posture that needlessly gambled with the economic future of its insured, Prairie Farms.

135.  At all times relevant hereto, Travelers owed a duty to Prairie Farms to settle Johnson's claims against Prairie Farms in the Underlying Action within the limits of available coverage.

136.  At all times relevant hereto, Travelers owed a duty to Prairie Farms to make its policy limit available in settlement of the Underlying Action so that the duty of the excess carriers above Travelers Policy would be triggered to contribute to settlement.

137.  Contrary to the duties Travelers owed to Prairie Farms, Travelers breached these duties in one or more of the following respects:

a.  placed its interests ahead of the interests of its insured as described herein;

b.  failed to give as much consideration to Prairie Farms' interests as it gave to its own interests as described herein;

c.  refused to settle Johnson's claims against Prairie Farms in the Underlying Action as described herein;

d.  chose to cavalierly gamble with its insured's money as described herein;

e.  failed to exercise care and skill to insulate its insured from liability;

f.  failed to timely tender the Travelers Policy given the facts of the Underlying Action;

g.  failed to timely tender the Travelers Policy given the grave financial risks to its insured, Prairie Farms;

h.  failed to fully and fairly investigate the Johnson claim in the Underlying Action;

i.  failed to fully and fairly evaluate the merits of the Johnson claim in the Underlying Action;

j.  failed to settle the Johnson claim by repeatedly offering less than it was reasonably worth;

k.  misrepresented its policy language in an effort to defeat coverage where coverage existed;

27

l.    interfered with its insured's defense in the Underlying Action by attempting to intervene as if Travelers were an actual named party entitled to co-equal participation;

m.   gambled with the economic future of its insured, Prairie Farms; and,

n.    failed to tender its policy limit in the Underlying Action so that excess carriers above it could meaningfully contribute to settlement.

138.    As a direct and proximate result of Travelers' conduct as set forth above, Prairie Farms was subjected to a judgment in the amount of $241,000,000.00, exceeding all available insurance.

139.    As a direct and proximate result of Travelers' conduct as set forth above, Prairie Farms was harmed and forced to expend large sums of money in an amount to be proven at trial.

140.    As a direct and proximate result of Travelers' conduct as set forth above, Prairie Farms has suffered and will continue to suffer severe financial hardship in the operation of its business affairs as will be proven at trial.

141.    As a direct and proximate result of Travelers' conduct as set forth above, Prairie Farms suffered reputational harm to its business as will be proven at trial.

142.    As a direct and proximate result of Travelers' conduct as set forth above, Prairie Farms suffered damages resulting an unsatisfied outstanding Judgement in favor of Johnson in the amount of $241,000,000.00, and the associated impairment of Prairie Farms' ability to conduct its business, consequential damages and attorney's fees in amounts to be proven at trial.

WHEREFORE, the Plaintiff, PAULA JOHNSON, demands judgment against the Defendant, TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, in an amount to be determined at trial to compensate for the harm and losses as described herein, together with the costs of this action.

28

**COUNT II: Bad Faith (Willful and Wanton – Punitive Damages)**
**_(Plaintiff v. Defendant TRAVELERS)_**

143.    Plaintiff repeats and re-alleges Paragraphs 1 through 120 as if fully set forth herein.

144.    At all times relevant hereto, had a duty to refrain conduct constituting malice, recklessness, indifference, and/or a gross disregard of Prairie Farms interests

145.    At all times relevant hereto, Travelers owed a duty to Prairie Farms to not place its interests ahead of the interests of its insured.

146.    At all times relevant hereto, Travelers owed a duty to Prairie Farms to give as much consideration to Prairie Farms' interests as it gave to its own interests.

147.    At all times relevant hereto, Travelers owed a duty to Prairie Farms to refrain from conduct constituting fraud, willfully and wanton conduct, or bad faith in refusing to settle a case within policy limits.

148.    At all times relevant hereto, Travelers owed a duty to Prairie Farms to not gamble with its insured's money.

149.    At all times relevant hereto, Travelers owed a duty to Prairie Farms to exercise care and skill to insulate its insured from liability.

150.    At all times relevant hereto, Travelers owed a duty to Prairie Farms to not unreasonably or vexatiously delay tender of the Travelers Policy given the facts of the Underlying Action.

151.    At all times relevant hereto, Travelers owed a duty to Prairie Farms to not unreasonably or vexatiously delay the tender of the Travelers Policy given the grave financial risks to its insured, Prairie Farms.

152.    At all times relevant hereto, Travelers owed a duty to Prairie Farms to fully and fairly investigate the Johnson claim.

153.    At all times relevant hereto, Travelers owed a duty to Prairie Farms to fully and fairly evaluate the merits of the Johnson claim.

154.    At all times relevant hereto, Travelers owed a duty to Prairie Farms to not attempt to settle the Johnson claim for less than it was reasonably worth.

155.    At all times relevant hereto, Travelers owed a duty to Prairie Farms to not misrepresent its policy language in an effort to defeat coverage where coverage existed.

156.    At all times relevant hereto, Travelers owed a duty to Prairie Farms to refrain from conduct that interfered with its defense in the Underlying Action by attempting to intervene as if Travelers were an actual named party entitled to co-equal participation.

157.    At all times relevant hereto, Travelers owed a duty to Prairie Farms to refrain from vexatiously taking a settlement posture that needlessly gambled with the economic future of its insured, Prairie Farms.

158.    At all times relevant hereto, Travelers owed a duty to Prairie Farms to settle Johnson's claims against Prairie Farms in the Underlying Action within the limits of available coverage.

159.    At all times relevant hereto, Travelers owed a duty to Prairie Farms to its policy limit in the Underlying Action so that the duty of the excess carriers above it would be triggered to contribute to settlement.

160.    Contrary to the duties Travelers owed to Prairie Farms, Travelers willfully and wantonly breached these duties in one or more of the following respects:

   a.    Intentionally and recklessly placed its interests ahead of the interests of its insured as described herein;

   b.    Intentionally and recklessly failed to give as much consideration to Prairie Farms' interests as it gave to its own interests as described herein;

30

c.  Intentionally and recklessly refused to settle Johnson's claims against Prairie Farms in the Underlying Action as described herein;

d.  Intentionally and recklessly chose to cavalierly gamble with its insured's money as described herein;

e.  Intentionally and recklessly failed to exercise care and skill to insulate its insured from liability;

f.  Intentionally and recklessly failed to timely tender the Travelers Policy given the facts of the Underlying Action;

g.  Intentionally and recklessly failed to timely tender the Travelers Policy given the grave financial risks to its insured, Prairie Farms;

h.  Intentionally and recklessly failed to fully and fairly investigate the Johnson claim in the Underlying Action;

i.  Intentionally and recklessly failed to fully and fairly evaluate the merits of the Johnson claim in the Underlying Action;

j.  Intentionally and recklessly failed to settle the Johnson claim for less than it was reasonably worth;

k.  Intentionally and recklessly misrepresented its policy language in an effort to defeat coverage where coverage existed;

l.  Intentionally and recklessly interfered with its defense in the Underlying Action by attempting to intervene as if Travelers were an actual named party entitled to co-equal participation;

m.  Intentionally and recklessly gambled with the economic future of its insured, Prairie Farms; and,

n.  Intentionally and recklessly failed to tender its policy limit in the Underlying Action so that excess carriers above it could meaningfully contribute to settlement.

161.    As a direct and proximate result of the willful and wanton conduct of Travelers as set forth above, Prairie Farms was subjected to a judgment in the amount of $241,000,000.00, exceeding all available insurance.

31

162.    As a direct and proximate result of the willful and wanton conduct of Travelers as set forth above, Prairie Farms was harmed and forced to expend large sums of money in an amount to be proven at trial as a result of Travelers' conduct.

163.    As a direct and proximate result of the willful and wanton conduct of Travelers as set forth above, Prairie Farms has suffered and will continue to suffer severe financial hardship in the operation of its business affairs as will be proven at trial.

164.    As a direct and proximate result of the willful and wanton conduct of Travelers as set forth above, Prairie Farms suffered reputational harm to its business as will be proven at trial.

165.    As a direct and proximate result of the willful and wanton conduct of Travelers as set forth above, Prairie Farms suffered damages resulting an unsatisfied outstanding Judgement in favor of Johnson in the amount of $241,000,000.00, and the associated impairment of Prairie Farms' ability to conduct its business, consequential damages and attorney's fees in amounts to be proven at trial.

166.    Travelers' actions as set forth above were all done with malice, recklessness, indifference, and gross disregard of Prairie Farms interests, justifying an award of punitive damages to deter Travelers from engaging in such outrageously harmful behavior in the future.

WHEREFORE, the Plaintiff, PAULA JOHNSON, demands judgment against the Defendant, TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, and award of punitive damages to deter Travelers from engaging in such outrageously harmful behavior in the future.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. Proc. 38(b), Plaintiff hereby requests a trial by jury on all issues so triable by right.

Dated: March 31, 2026

By:  _____

*One of the Attorneys for Plaintiff*

Steven D. Pearson
Johnathan C. Koechley (admission pending)
**SMITH, GAMBRELL & RUSSELL, LLP**
155 North Wacker Drive, Suite 3000
Chicago, IL  60606
T: (312) 360-6000
F: (312) 360-6520
sdpearson@sgrlaw.com
jkoechley@sgrlaw.com

John F. Kennedy (admission pending)
Elizabeth Babbitt
**TAFT STETTINIUS & HOLLISTER LLP**
111 East Wacker Drive, SUITE 2600
Chicago, IL 60601
T: (312) 360-6000
F: (312) 360-6520
jkennedy@taftlaw.com
ebabbitt@tafllaw.com

Lance D. Northcutt
**SALVI, SCHOSTOCK & PRITCHARD P.C.**
161 North Clark Street, Suite 4700
Chicago, IL 60601
T: (312) 372-1227
F: (312) 372-3720
lnorthcutt@salvilaw.com

*Attorneys for Plaintiff Paula Johnson*

SGR/81886591.1

33